**Affirmed and Memorandum Opinion filed February 24, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00543-CV

---

## IN THE INTEREST OF C.A.L. A/K/A C.L.-V., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-01657J**

---

## M E M O R A N D U M   O P I N I O N

The trial court terminated a mother's parental rights to her one-year-old child, C.A.L., on the predicate ground of failure to comply with her family service plan. The court also found that termination was in the child's best interest and appointed the Department of Family and Protective Services (the "Department") as sole managing conservator. On appeal, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's predicate-ground and best-interest findings. Because we conclude that legally and factually sufficient evidence supports the trial court's findings, we affirm the judgment.

## Background

C.A.L., a female child, was born in August 2020. Two days after her birth, the Department received a referral alleging neglectful supervision by C.A.L.'s father ("Father"). The referral alleged that there had been "past domestic violence in the family home," including two incidents in May 2020, while C.A.L.'s mother ("Mother") was pregnant with C.A.L., which resulted in Mother seeking medical treatment. The Department believed there was "a continuing danger to [C.A.L.] if she were to be returned to the home of her parents." Specifically, the Department identified the domestic violence and Mother's "untreated mental health," about which Mother would not provide any information to address the Department's concerns. Further, a Department investigator interviewed a nurse at the hospital where Mother gave birth to C.A.L., and the nurse stated that Mother "wasn't interacting with [C.A.L.] much and didn't want to feed her." Mother refused to "talk about anything that has happened in the past without a lawyer present" and refused to provide information regarding placement options. Mother ultimately agreed to place C.A.L. with the child's maternal grandmother.

The Department filed a petition to terminate Mother's and Father's parental rights. At trial on the Department's petition, the following evidence was presented.

Mother had prior history with the Department. Mother had three children before C.A.L. but had custody of none of them. Two of the children, twins, lived with their maternal grandmother.[1] Mother signed an irrevocable affidavit of relinquishment of parental rights regarding at least two of the three children. In a prior case involving one of Mother's children, "there were . . . homicidal ideations

---

[1] It is unclear from the record whether the third child also lived with the maternal grandmother. According to the Department's removal affidavit, that child may have lived with the child's aunt.

towards the child." Trisha West, the primary caseworker in this case, testified that Mother had "a history of noncompliance and she does not have custody of any of her children and it's an ongoing concern in this case as well."

West testified that Mother had "a substantial history with the [Department] for mental health issues." Mother was diagnosed with bipolar disorder and had been hospitalized several times. West did not believe that Mother was managing her mental health issues.

West testified that Father also had a history with the Department and that his parental rights over one of C.A.L.'s older siblings had been terminated on "(d) and (e) grounds,"[2] which constituted grounds for termination in this case. At the time of trial, Father was on supervised release for assault of a family member.[3]

The Department created a family service plan for Mother. According to Department caseworker Teara McKentie, the plan required Mother "to have stable employment or income for at least six months; to maintain stable housing; to participate in parenting classes; [to submit to] random drug testing for urinalysis and for hair follicles, as well as alcohol testing; to participate in a psychological evaluation; [and to complete] domestic violence classes." McKentie testified that

---

[2] Under the Family Code, termination is warranted if, inter alia, the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). The statute further provides that parental rights may be terminated if clear and convincing evidence supports a finding that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." *Id.* § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), to which West was referring when testifying about Father's previous terminations, that ground becomes a basis to terminate that parent's rights to other children.

[3] The trial court terminated Father's parental rights to C.A.L. Father has not appealed the judgment.

Mother was not compliant with the service plan. West testified that Mother refused to meet with her for the first five months before agreeing to complete the required services. According to West, Mother had "complied with the services on the service plan," except she refused to comply with additional court orders to submit to hair follicle drug testing and to sign a release for her psychiatric records. The trial court took judicial notice of two occasions on which Mother submitted to a urinalysis but refused a hair follicle test. Under Mother's service plan, no-shows or refusals were considered positive results. McKentie, who had been the Department caseworker for Mother's three other children, testified that Mother had "used drugs in the past."

McKentie testified that Mother visited C.A.L. "very scarcely" during C.A.L.'s placement with her grandmother. When Mother visited, "it would not be at the agreed-upon time and it would only be for 5 to 10 minutes. And she would take pictures and she would leave." Both West and McKentie said that Mother had not provided any type of support to C.A.L. throughout this case, which the grandmother corroborated. C.A.L.'s grandmother testified that Mother visited the child three times and that C.A.L. would cry during the visits because the child was "not accustomed to [Mother]."

West testified that the Department's concerns in this case were Mother's untreated mental health issues and the history of domestic violence. Similarly, McKentie testified that the Department was concerned about Mother's parenting ability because Mother had "not completed all of the services that were recommended by the [Department]," such as complying with the hair follicle testing. McKentie also said that "[i]t does not appear that [Mother] has a bond with the child due to her -- due to her lack of visitation. And she doesn't actually spend any time with the child." Further, McKentie believed that Mother was still

4

in a relationship with Father, "there's a domestic violence situation that is ongoing with their relationship," and Mother did not complete a domestic violence course as ordered. In sum, Mother had not demonstrated "any change in the original circumstances" when C.A.L. was placed into care.

For her part, Mother testified that she believed she could manage her bipolar disorder: "I recognize when I'm -- when I need to isolate myself and just recover, you know what I mean, to things that heal me. So when . . . episodes come, I do things to, you know, be healthy again." She testified that she had given a list of her prescription medications to the Department, but she admitted that she had refused to provide a release of information from her psychiatrist to the Department. Mother testified that she had "a great relationship" with her psychiatrist. Mother also said that she loved her daughter and thought they were "well bonded." Mother looked forward to "being a Mom." Mother testified that she lived rent-free in an apartment behind her father's house and could provide a safe environment for C.A.L. Mother asserted that she was no longer in a relationship with Father and had filed a petition to divorce him. Mother denied ever using illegal drugs and testified that all her drug tests in this case came back negative.

At the conclusion of the trial, the court found clear and convincing evidence that Mother did not comply with the provisions of the court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(O). The court further found that termination of Mother's rights was in C.A.L.'s best interest and that the Department should be appointed C.A.L.'s sole managing conservator. *See id.* § 161.001(b)(2). Based on these findings, the court signed a final order terminating Mother's parental rights to C.A.L.

Mother timely appealed.

**Analysis**

## A. Standards of Review

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). *See* Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *See In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the challenged finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336,

344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *See id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (internal quotation omitted). We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Predicate Ground

In her first issue, Mother argues the evidence is legally and factually insufficient to support termination under the predicate ground on which the court relied, namely subsection 161.001(b)(1)(O).

To terminate parental rights pursuant to subsection (O), the Department must show that (1) the child was removed under chapter 262 of the Texas Family Code for abuse or neglect, (2) the child has been in the managing conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the

7

provision of a court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code § 161.001(b)(1)(O). Mother challenges the first and third elements of subsection (O); she does not dispute that C.A.L. had been in the Department's custody for at least nine months.

Mother first argues that there is no evidence to show that C.A.L. was removed as a result of abuse or neglect by Mother. The record refutes Mother's contention.

The words abuse and neglect are "used broadly" in the context of subsection (O) and "necessarily include[] the risks or threats of the environment in which the child is placed." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). Thus, if a parent has neglected, sexually abused, or "otherwise endangered her child's physical health or safety," such that initial and continued removal are appropriate, the child has been removed from the parent under chapter 262 for the abuse or neglect of the child. *See id.*

Here, McKentie testified that C.A.L. "came into care for neglectful supervision, along with substance abuse." The removal affidavit, filed in support of the Department's original petition, provided that a hospital nurse stated that Mother "wasn't interacting with [C.A.L.] much and didn't want to feed her." The affidavit also provided that there was a history of domestic violence at the family home and that there was a continuing danger to C.A.L. if she were to be returned to the home of her parents. While in the hospital after giving birth to C.A.L., Mother denied to the Department investigator that there had ever been instances of domestic violence in the home, despite having twice sought medical treatment during pregnancy as a result of domestic violence. Mother believed that she and Father were "suitable" caregivers. Prior to removal, Mother refused to cooperate with the Department's investigator or to provide information regarding her mental

8

health treatment in response to the Department's concerns, which were predicated on Mother's history of untreated bipolar disorder (including symptoms of paranoia and mood instability) and her past homicidal comments regarding another child.

After an adversary hearing, the court found sufficient evidence to satisfy a person of ordinary prudence and caution that C.A.L. faced an immediate danger to her physical health or safety, that the urgent need to protect her required her immediate removal, and that she faced a substantial risk of a continuing danger if she were returned home. Mother did not challenge those findings.[4]

The Department's evidence and the trial court's orders establish that C.A.L. was removed from Mother under chapter 262 for abuse or neglect. Specifically, Mother's inability or unwillingness to feed or interact with her newborn infant, Mother's willingness and intention to take the child back into an unstable home environment with Father where there had been prior instances of domestic violence, and Mother's inability or unwillingness to prove that she was treating her bipolar disorder support the court's finding. *See id.* at 248-49; *see also In re J.S.G.*, No. 14-08-00754-CV, 2009 WL 1311986, at *6-7 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (relying on caseworker's affidavit in support of the Department's removal request, as well as trial court's temporary orders concluding that the children faced a danger to their physical health or safety and a substantial risk of a continuing danger if returned home, to conclude that the evidence established that the children were removed "as a result of neglect specific to them by" the mother).

Mother next argues that she completed the services required under the plan "to some extent," just "not to the satisfaction of the [Department]."

___

[4] *See In re E.C.R.*, 402 S.W.3d at 248 & n.8 (noting that mandamus relief is available to challenge trial court's findings in support of removal).

McKentie testified that Mother was not compliant with the service plan. West testified that "[o]n the actual family plan of service, there's nothing left for [Mother] to complete." When asked why the Department was seeking termination under subsection (O) if Mother had finished the plan, West stated, "Because she was ordered to sign a release for her psychiatric records and she failed to do so." Mother admitted that she was aware of the requirement to follow court orders, that she knew one of the consequences of not following court orders was termination of her parental rights, and that she decided not to comply with the "specific thing" of providing a release of her psychiatric records. Mother also admitted that she did not submit to all requests for court-ordered hair follicle testing and that she was not employed.

The record contains sufficient undisputed evidence that Mother knew what was required by the family service plan, including additional court orders to implement or require compliance with the plan, and understood her failure to comply was a ground for termination of her parental rights. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *3-4 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (mem. op.) (holding that trial court can take judicial notice of prior proceedings and that parent's testimony reflecting knowledge of family service plan and its consequences was sufficient to uphold trial court's finding under subsection (O)).

To the extent that Mother's contention that she completed the plan "to some extent" raises an argument of substantial compliance, her assertion is unavailing. Substantial or partial compliance with a court-ordered family service plan is generally insufficient to avoid termination pursuant to subsection (O). *See In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The Family Code does not provide for substantial compliance with a family

10

services plan."); *In re T.T.*, 228 S.W.3d 312, 319-20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have uniformly found substantial compliance with the provisions of a court order inadequate to avoid a termination finding under subsection (O)). Whether a parent has "done enough" to comply with the court-ordered service plan under subsection (O) is generally a fact question. *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014). We defer to the fact finder's determination that Mother's refusals to comply with hair follicle testing requests, as well as her refusal to provide her psychiatric records and her inability to obtain and maintain stable employment, demonstrated a failure to comply with the court's orders sufficient to terminate Mother's parental rights under subsection 161.001(b)(1)(O). *E.g.*, *In re A.D.*, 203 S.W.3d 407, 411-12 (Tex. App.—El Paso 2006, pet. denied) (affirming termination under subsection (O) because parent failed to meet service plan's material requirements including drug assessment, finding a job, and providing a safe home).

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(O). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(O). Accordingly, we conclude the evidence is legally and factually sufficient to support the 161.001(b)(1)(O) finding. We overrule Mother's first issue.

## C.    Child's Best Interest

In Mother's second issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.

11

1. *Applicable law*

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The fact finder may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

2. *Application*

We review the *Holley* factors in light of the evidence at trial. Applying them, we observe that neither party presented testimony regarding C.A.L.'s desires. However, the Department's caseworkers testified that C.A.L. had bonded

12

well with her grandmother and her siblings who also lived with the grandmother. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (when children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent). The Department also presented evidence that C.A.L.'s grandmother was capable of meeting the child's present and future emotional and physical needs. McKentie believed that C.A.L. was safe and that her grandmother could provide a safe environment long term. According to West, C.A.L. had "been with the grandmother for her entire life."

In contrast, the evidence at trial established that Mother only visited C.A.L. three times during the pendency of the case, for very short durations, during which C.A.L. would become upset. Mother testified that C.A.L.'s grandmother prevented Mother from visiting, but the grandmother disputed Mother's claims. The trial court was free to believe the grandmother's testimony and disbelieve Mother's. Thus, *Holley* factors 1, 2, and 7 weigh in favor of the trial court's finding.

The evidence also showed that Mother had a history of mental illness, for which she may or may not have sought treatment. For instance, West testified that she did not think Mother was treating her bipolar disorder. Mother testified that she saw her psychiatrist once every two to three months, or once every six months, and she was on medication to treat her bipolar disorder and anxiety. But Mother refused to release her medical records to the Department for review, as ordered by the court. When asked what she did to manage her mental health, Mother stated, "I stay really, really close to God. He's like the apple that I bite. I do a lot of yoga. I stay around people who lift me up, are not manipulative." The trial court reasonably could conclude, by crediting the Department's evidence of Mother's

13

history of untreated bipolar disorder and her refusal to show proof of a treatment plan and by not crediting Mother's vague assertions, that Mother in fact was not treating her mental health condition and that Mother's untreated mental health posed a danger to C.A.L.'s physical and emotional needs. Thus, *Holley* factors 3 and 8 also weigh in favor of the trial court's finding.

Mother successfully obtained housing and expressed her belief that she could provide a stable and safe home for C.A.L. However, West testified that she had a safety concern regarding Mother's home, specifically that "she has two geese that she owns in front of the front yard and they bite. And [Mother] said that she was not going to get rid of the geese." Further, Mother lived in an apartment rent-free, never provided proof of income, and admitted that she was not employed. Mother previously had received government benefits but was no longer receiving those at the time of trial. According to West, Mother did not have "any way to provide for the child." C.A.L.'s grandmother stated that Mother never provided any support for the child. This evidence addresses *Holley* factor 4 and weighs in favor of the trial court's finding.

We conclude that there is legally and factually sufficient evidence to support the trial court's finding that termination was in C.A.L.'s best interest. Although Mother expressed love for her daughter and claimed she could provide a stable home appropriate for C.A.L., the Department's caseworkers testified that Mother had not secured a stable home, employment, or income. Mother also did not meaningfully visit or provide support for C.A.L. McKentie testified that Mother had not demonstrated "any change in the original circumstances" that existed when C.A.L. was placed into care. From Mother's inability or unwillingness to effect positive environmental and personal changes, the trial court reasonably could have inferred Mother's parental abilities weighed in favor of finding termination was in

C.A.L.'s best interest.  *See In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in C.A.L.'s best interest.  *See* Tex. Fam. Code § 161.001(b)(2).

We overrule Mother's second issue.

### Conclusion

We affirm the trial court's judgment.

/s/    Kevin Jewell
       Justice

Panel consists of Justices Jewell, Zimmerer, and Hassan.  (Hassan, J., concurring in the judgment only.)